## DUNLOP, MONCURE & Co. *v.* Executors of ALEXANDER GORDON.

Defendants guaranteed that O. would consign to the plaintiffs sugar of the value of $30,000, which O. failed to do. *Held :* That defendants were only liable for $30,000 and interest at five per cent. ; that they were not liable beyond that amount as for commissions on the advances made to O , on faith of the guaranteed consignment, and for exchange, &c.

APPEAL from the Fifth District Court of New Orleans.

*Benjamin, Micou & Finney*, for plaintiffs and appellants :

The additional stipulations we copy verbatim from the agreement on file, p. 42 :

" The estate of *Gordon* is to be credited with the full amount received, or that may be received, by said *Dunlop, Moncure & Co.* for the one-third of the entire crops, or anything else arising from or out of said plantation, slaves, &c., by sale or otherwise. It being agreed and understood that the said estate of *Gordon* is held responsible for any deficiency or loss that may occur to prevent the said *Dunlop, Moncure & Co.* from getting the full amount for which the said estate of *Gordon* is liable as guarantee for said *Oxnard.* It being also under-

DUNLOP
v.
GORDON.

stood and agreed that in case the said *Dunlop, Moncure & Co.*, or the executors or representatives of the estate of *Gordon*, should desire at any time (after the receipt of the present growing crops) that the said one-third interest be sold, it is to be offered for sale (by partition or otherwise) on as favorable terms as usual in such cases, by giving credit to purchasers, so as to induce them to give a fair price for the property ; in which case the said estate of *Gordon* is bound to make good the amount for which it is liable as guarantee for *Oxnard*. Witness our hands at New Orleans, this 2d day of August, 1849."

The extent of the liability of the defendants must be determined by a fair construction of the letter granted, which we have copied above.

In the case of *Thompson* v. *Packwood*, 2 Ann. 624–5, the violation of an agreement to consign a crop for sale, imposed a liability for the commissions that would have been earned if the agreement had been fulfilled. If a surety had been bound for the consignment, it is obvious that the refusal of the principal to make it, would have bound him also for the commissions. The profits resulting from the consignment in commissions is one of the inducements to the advance. It is not merely a lending of money to be repaid in kind, but it is a transaction intended to secure the commissions on sales and advances, as well as the current interest.

The District Court rejected the commissions, on the ground that the contract of a surety must be strictly construed, citing the Code, 3008 ; *Canal Bank* v. *Hagan*, 1 Ann. R., 56 ; *Freeland* v. *Briscoe*, 3d Ann., 256 : and as commissions are not named in the contract, considered them not embraced in the guarantee.

It would seem that the very next article of the Code would be a sufficient answer to this position ; as it declares that a general and indefinite suretyship extends to all the accessories of the debt. Code 3009. If commissions, although not expressed, are accessory to the contract resulting from a consignment of merchandize, then the party who binds himself that a consignment shall be made, binds himself for the commissions.

Nor does the article cited by the court declare that the contract of the surety is to be strictly construed. It says that suretyship cannot be presumed, but ought to be expressed, and "is to be restrained within the limits intended by the contract."

The rule is equally applicable to all other contracts, as no contract ought to be extended beyond the intention expressed in it. Interpretation is, therefore, invoked, in order to ascertain the true intention ; and in the application of the rules laid down for that purpose, the law recognizes no distinction, whether the contract is a principal obligation, or one of suretyship. Thus, if the principal and surety contract in the same words, it would be out of the question to say that one was bound differently from the other. If the words are free from ambiguity, there is no room for construction. If there is an ambiguity, it must be considered under the general rules of interpretation, in order to discover what was the intention ; but when that intention is reached, it is the same, in the case supposed, as to all the obligors, whether principals or sureties.

This subject is considered by Burge on Suretyship, and he has collected the opinions of the civil law writers, (p. 40 to 46,) and the conclusion to which he arrives is, that the rule of construction, *potius contra proferentem*, is applicable to suretyships as well as to other contracts. This is the rule for the interpretation of contracts in general, as laid down in the English text of A. 1952, and as nothing in the special rules for contracts of suretyship excepts that contract from the general rule, it must be governed by it. Indeed, the art. 3009, declaring that the contract embraces accessories, though not expressed, seems to be in the same spirit with the general rule.

The rule is the same at common law and in civil law. Pothier says that the surety who binds himself generally for a contract, binds himself *in omnem causam*. One of his illustrations is the case of a surety for a lease, who is considered bound not only for payment of the rents, but also for injuries to the buildings, (*degradations*,) for the movables used on the farm, for arrearages, &c. &c, Pot. obl. 505.

Troplong on Cautionnement quotes Casaregis, and adopts his conclusions : Simplex fide jussor alicu juscontractus non solum obligatur ad id ad quod principalis debitor expresse aut directe tenetur ; sed obligatur etiam pro omnibus illis casibus et causas non expressis, quœ possint provenire ex naturi ipisius contractus. No. 158, to same point, Ponsots, Caution., n. 118.

<div style="float:right">DUNLOP<br>v.<br>GORDON.</div>

At common law the rule is the same. The surety "*is understood*" to be obliged to the same extent with the principal, unless he has expressly limited his obligation. Theobald 69, 901 Law Lib.; Pitman 33, 40, Law Lib.

The plaintiffs had an interest in the sale of the property arising out of their claims upon it, but by this agreement they also recognized an interest in the guarantors, and agreed to purchase, so to speak, for their own account.

"Le mandat peut se trouver co-ordonné avec d'autres contrats et agissements, sans pour cela que son existence en soit compromise ou effacée." Troplong, Mand., N. 98. An example may be found in N. 35 of the same book, of a debtor transferring to his creditor a claim upon a third person, to be collected and applied. This is at once a transfer and a mandate. It is also a mandate for the joint interest of the parties, for the transferree, in collecting, acts as well for his own interest as for the interest of the transferrer.

Being a mandate, all advances made under it by the attorney bear interest by law. (Code 2294.)

The advances made in the present case are of two classes: one, the expenses of administration and of re-sale; the other, the payment of prior mortgages which became necessary to perfect the title of the plaintiffs. With respect to the first class, the plaintiffs were clearly entitled to reimburse themselves out of the very first receipts. (Code 2992.) If, therefore, the interest upon these were reduced to the legal rate of five per cent. and the first receipts applied to them, the account would be still more favorable to the plaintiffs than it now is. This class of disbursements amount to less than $8,000, of date (reduced to average) in April, 1850, while the receipts to January, 1850, amount to near $11,000. On the latter, under the contract of mandate, the plaintiffs would owe no interest, unless it were proved that they had employed the moneys received for their own use. (Code 2984.) The account is made up, however, with interest at the same rate on both sides, which is the most liberal principle for the benefit of the defendants.

With regard to the second class of payments for prior mortgages, they all bore interest according to their tenor. Thus all the *Howell* notes, amounting to about $20,000, bore interest at 8 per cent., and the Citizens' Bank instalment at the rate fixed by its charter. These debts having become the debts of the plaintiffs by the purchase of the property on which they bore mortgage, the plaintiffs, by their payment, became subrogated to the rights of the original creditors, and consequently entitled to the same rate of interest. (Code 2157.) It would indeed be a monstrous result, if the plaintiffs, having assumed this position, as the mandatories of the guarantors, and for their interest, were to be deprived of interest on the debts which they became thus compelled to pay, and which were bearing interest at the time of the payment.

While on the subject of interest, we may observe that the original letter of credit is also recognized by the authorities as a mandate. (*Amory* v. *Boyd*, 5 Mart., 414; *Gasquet* v. *Thorn*, 14 Louis. 509; Pothier Mand., 18; Troplong, 35.) The rule of the Code 2994, that interest must be paid for advances, applies to the original advances under the guarantee.

*Miles Taylor & H. H. Taylor*, for defendants:

"Suretyship must be restrained within the limits intended by the contract. C. C., 3,008. Suretyship must be construed strictly, the law favors the surety. *N. O. Canal and Banking Co.* v. *Hagan*, 1 Ann. 62. There can be no presumptions against the surety. *Freeland* v. *Briscoe*, 3 Ann. 256.

*Pothier* says: "Where the security has expressed the sum and cause for which he became security, his obligation does not extend beyond the sum and cause expressed." For example: If one had become a security for my lessee for the payment of his rent, he will not be answerable for the other obligations of the rent, such as might result from waste or from the advances that I might have made to the lessee. If one had become a security for the principal sum due by the debtor, he will not therefore be liable for the interest that may accrue. Pothier on Obligations, No. 404 of Evans' Trans., No. 405 Paris Ed. Burge on Suretyship, p. 53. "Lorsqu'on se rend caution pour quelqu'un, l'engagement ne vas pas au delà de la somme ou de la cause exprimée; de sorte que, si la somme produit des intérêts, la caution ne sera pas responsable de ces intérêts, à moins que le cautionnement soit général."—Merlin, verbo Caution, §1, No. 3. These authorities shew, that from the nature of the obligation, no interest is due, and that nothing can be claimed beyond the specific sum guaranteed.

But if plaintiffs say, true it is Mr. *Gordon* himself could not be compelled to pay more than the specific sum, but his Succession, under arts. C. P. 988, 989, which allow interest at 5 per cent against Successions, is liable for interest at that rate, we answer, that these articles very clearly only apply to those debts *which from their nature bear interest.* This is no longer open to argument, inasmuch as it is now the settled jurisprudence of the State.    The Supreme Court, in the Succession of Durnford, 1 Ann. 93, say : " We do not understand articles 988, 989 of the C. P. and others relied on by counsel for the appellants, as binding Successions to pay interest, where by the nature of the debt no interest is due, but as providing that the payment of interest due or stipulated, shall not be affected by the administration which the Succession is under, and as putting the Succession on the footing of an ordinary debtor as to its liability to pay interest, and dispensing with the necessity of a judicial demand."

SLIDELL, C. J.   In the letter addressed by *Gordon* to the plaintiffs, he did not bind himself as surety of the *Oxnards* for the debt they were about to contract, with all its incidents and accessories.   He only made himself responsible for the due consignment by Messrs. *Oxnard* to plaintiffs' house at Richmond, between 4th March, 1848, and July 31, of that year, of sugars to the full and fair value of $30,000.   The letter is entirely silent as to the charge of commissions for advancing and exchange ; and to hold the surety for those charges, in addition to the $30,000, would be to hold him beyond the specific subject-matters and amounts for which he undertook responsibility.   If the *Oxnards* had shipped to plaintiffs' address, prior to 1st August, sugars to the full and fair value of $30,000, or if *Gordon* had done it in their stead, his suretyship would have been fulfilled.   Such shipments would have put the plaintiffs in possession of property of the value of $30,000.   This not having been done, that amount is the measure of *Gordon's* liability, and may be considered as due by him on 1st August, 1848.

The guarantee being silent as to interest, we think interest should run against *Gordon* only at five per cent.   It is true that *Gordon* was subsequently party to a written agreement by which the *Oxnards* agreed for eight per cent. interest ; but the terms of that instrument seems to us stringently to exclude any implication of an intention to enlarge the suretyship.   It was expressly declared that the responsibility should be left precisely such as resulted from the letter of guarantee, and *Gordon's* estate should not be answerable for any amount in principal, interest, commission and exchange, for which it was not already answerable under the letter.

Under the various agreements respecting the purchase, at the judicial sale of the mortgaged property, its administrations, and resale, it is clear the plaintiffs must have credit for all antecedent incumbrances paid off by them, and for all disbursements necessarily made for expenses of administration and resale. The principal sums for these items are correctly stated in the accounts annexed to the petition.

The account, which is confessedly correct as to the *Oxnards*, must be reformed as to defendants, by excluding the charges for exchange and commission on the advance of $30,000, and reducing interest on that sum from eight to five per cent., to run from 1st August, 1848.

We think the plaintiffs are entitled to charge in account five per cent interest upon the amount of principal and interest of the *Howell* notes paid by them ; this five per cent. interest to run from the date of payment by plaintiffs of said notes respectively.   In paying those notes under the agreements, they may be considered as having acted as the mandataries of the defendants.   We cannot allow eight per cent. interest on the sums thus advanced, as there was no express agreement between plaintiffs and defendants to that effect.

Interest should also be charged only at five per cent. on the amount paid to the Citizens' Bank and *Berthoud* from the dates of the respective payments, and on the other items of disbursement.

The item for fees paid to counsel appears to have been an expense incurred in the administration of the property and its resale under the agreement, and was properly chargeable in the accounts. The reasonableness of the fee we do not understand as being disputed.

The defendants object to the charge of eight per cent. discount on the four unmatured notes credited in the account. As there was no agreement allowing plaintiffs to discount them at that rate, they are to be credited as cash at the period of their maturity.

We are unable to perceive by what right the estate of *Gordon* can claim reimbursement for the amount paid *Egana.* We understand it was for a mortgaged note which constituted an antecedent incumbrance on the plantation. The guarantor was responsible for any deficiency of the proceeds of the mortgaged property to meet the amount guaranteed, and cannot, therefore, be permitted to receive with one hand what he would have to pay back with the other.

An account stated with interest according to the principles above expressed, exhibits a balance on 1st April, 1854, in favor of plaintiffs for the sum of $2602 58-100.

It is therefore decreed, that the judgment of the District Court be reversed; and it is further decreed, that the plaintiffs recover of the said Succession of *Alexander Gordon*, to be paid in due course of administration, the sum of $2602 58-100, with interest from 1st April, 1854, until paid, and costs in both courts.